## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> **v.** <br><br> **FELICIA KONOLD and** <br> **CORY KONOLD** <br><br> **Defendant.** | **Case No. 1:21-cr-160-3, -4 (TJK)** |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court impose the following sentences:

**Felicia Konold**: 6 months in custody, 3 years of supervised release, restitution in the amount of $2,000, and the mandatory special assessment of $100.

**Cory Konold:** 3 months in custody, 3 years of supervised release, restitution in the amount of $2,000, and the mandatory special assessment of $100.

The government's recommended custodial sentences fall within the guidelines range as agreed to by the parties and as calculated in the presentence report [PSR]. The higher recommendation for Felicia Konold reflects her aggravated conduct, including outfitting herself for violence in advance of the riot and celebrating her leading role afterward.

## I.       INTRODUCTION

The defendants, Felicia Konold and Cory Konold (hereinafter "Felicia" and "Cory," and together "the Konolds"), participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote

count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Both defendants were enthusiastic members of the very first wave of rioters to overpower police at Peace Circle and force its way onto the Capitol grounds. They acted as part of a group that included members of the Proud Boys, whom the Konolds met on the morning of January 6 and marched with in the leadup to the riot. As reflected herein, the Konolds eagerly followed William Chrestman and other co-defendants as they engaged in obstructive and intimidating conduct at the Capitol building. For example, after unlawfully entering the restricted area, the Konolds positioned themselves with Chrestman and others at the front of the crowd, where Felicia shouted encouragement and both siblings threw the weight of their bodies against a police line. They ultimately entered the building, moving with a group that pursued police officers as it progressed deeper into the building, where Cory stole a police riot helmet as a trophy.

The government recommends that the Court sentence Felicia Konold to 6 months of incarceration and Cory Konold to 3 months of incarceration for their respective convictions for violating 18 U.S.C. § 231(a)(3). For both defendants, a custodial sentence is necessary to appropriately reflect their conduct and to serve the purposes of specific and general deterrence.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statements of Offense filed in this case, ECF 207 (Felicia); ECF 210 (Cory), for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    The Konold's Role in the January 6, 2021 Attack on the Capitol

Felicia Konold, in what appears to be her last journal entry prior to January 6, explained her motivations for traveling to Washington, DC: "I understand what the deep state is trying to do to humanity. And i truly do feel like it is my life mission to stop them…. I do not want to leave my son or my brother its tearing my heart, but i must protect the future…. This is what my life purpose is, to make sure good TRUMPS Evil." Gov Ex. 1 at 2 (capitalization in original). Evidently anticipating violence, she wrote a list of items that included "Bear Spray," "Walkie talkie," and "First Aid." *Id.* at 1.

#### *Approach to the Capitol Grounds*

The Konolds came to Washington, DC together on January 6. Early in the day, they encountered by chance a small group of members of a Kansas City chapter of the Proud Boys, including co-defendants William Chrestman, Christopher Kuehne, Louis Colon, and Ryan Ashlock. The Konolds asked whether they could accompany the Proud Boys and, when told they could, they joined with members of the Kansas City chapter, and later, a larger group of approximately 100 Proud Boys members and associates that marched from the Washington Monument to the Capitol Building, away from the planned speeches. They arrived at the First

Street gate near Peace Circle just as Congress was preparing to begin the certification proceedings at 1:00 p.m., as required by law. *See* Gov. Ex. 2.



*Still from Ex. 2 at 00:14 (Felicia and Cory Konold circled in red)*

### ***Breach at Peace Circle***

Between Peace Circle and the Capitol building stood multiple lines of physical barricades, including bike racks and temporary "snow fencing," manned at various points by uniformed officers of the U.S. Capitol Police (USCP). At intervals on the barricades were posted signs reading "Area Closed" in large text.

Within minutes of the group's arrival at Peace Circle, certain members of the crowd crossed the first line of barricades, approached a line of USCP officers who were guarding a fence inside the restricted area, and began trying to force their way past the police line. Other members of the crowd, including members of the Proud Boys, surged forward behind them. Upon seeing the confrontation between rioters and officers, the Konolds—along with Chrestman—moved forward through the crowd toward the skirmish. In the still below, Chrestman and Cory have their arms on each others' backs, and Felicia is visible between them in the tan hat with orange tape. *See* Gov. Ex. 3.



*Still from Ex. 3 at 00:12*

Once the crowd overpowered the officers and trampled the barricades, the Konolds followed Chrestman scrambling over a demolished snow fence and moved briskly toward the Capitol building.

### *Rioting on the West Front*

Inside the restricted area, the Konolds positioned themselves near the front of the crowd, staying close to Chrestman. As more and more rioters flooded into the west plaza, they remained near the front lines, where Felicia was especially vocal in opposing the police and inciting other rioters. She shouted and pointed at officers who were trying to calm the crowd, including one who was holding up a can of pepper spray as a warning. *See* Gov. Ex. 4.



*Still from Ex. 4 at 02:59*

Felicia shouted "Let him go!" at officers who were arresting an especially unruly rioter, while Chrestman beside her encouraged others, "Don't let them take him!"   *See* Ex. 4 at 3:28 – 3:32.

As the crowd again breached police ranks and progressed toward the building, the Konolds remained on the front line. They were stopped next at a line of bicycle racks manned by police in full riot gear, where a stalemate between the rioters and the officers took hold. During this period, as other rioters physically fought with police, Felicia encouraged them, shouting "Fight for America! Fight for America!" *See* Ex. 5 at 0:59-1:02. A short time later, the crowd's resistance intensified, and a physical struggle broke out as rioters tried to shove the barricades against the outnumbered officers who were attempting to resist. The Konolds participated vigorously in that struggle. Although the quality of the video recorded by a live steamer is poor, the video captures the sheer kinetic force of this confrontation. Both Felicia and Cory can be seen in Government Exhibit 5 pushing apparently with all their strength against bike racks that have been lifted from the ground as the Konolds and other rioters tried to overpower the police in a shoving match. The image below is provided only to assist in locating Felicia (recognizable from her tan hat with

orange tape) and Cory (recognizable from his grey helmet with orange tape) in the crowd; it is necessary to watch the video in motion to apprehend what is being depicted.



*Still from Ex. 5 at 7:27*

In a later social media post, Felicia made clear that she was a willing and committed participant in this violent clash with the police. She glowingly described her efforts as follows: "[E]veryone had my back, dude, everyone, fucking wall, legit, in the air, up against the fence. Pulled—three lines of police. Fence – me – not even on the ground, my feet weren't even on the ground. All my boys behind me, holding me up on the air, pushing back. We fucking did it!" Ex. 6 at 00:34 – 00:54.

### *Entry to the Building*

Eventually, the crowd reached the building and made forced entry. The Konolds remained close to Chrestman and the Kansas City Proud Boys members as they entered at the site of the first

breach of the building, at the Senate Wing Door, at approximately 2:25 PM, roughly twelve minutes after the initial breach.

At the time of the Konolds' entry, there were still parts of the building that had not yet been taken by rioters. The police, however, were continuously forced to retreat because of the rioters' overwhelming numbers, which allowed the crowd—including the Konolds and their Proud Boys companions—to progress further into the Capitol.

In particular, a group of rioters that included the Konolds and the Kansas City Proud Boys chased police officers out of the Crypt and into a passageway leading to the Capitol Visitor Center. Government Exhibit 7, which does not have sound, nonetheless shows the body language of the fleeing officers illustrating their urgency as they tried to escape to safety behind an overhead gate that was being lowered:



*Still from Ex. 7 at 00:16*

A clip of the same sequence from the viewpoint of a rioter, submitted here as Government Exhibit 8, provides additional perspective, including audio of the crowd shouting at officers. The same video shows Felicia standing directly beneath the descending gate and pushing up on it, with Cory just behind her watching, while others throw chairs and the fleeing officers and shout "you're

scared now, motherfucker!" When the officers retreated toward the Capitol Visitor Center, the Konolds and other members of the mob followed behind them.

The Konolds and other rioters then moved into the Capitol Visitor Center, following in the wake of the fleeing police, and remained there for a short time until they learned that a shooting had taken place near the House floor, after which they returned to the Senate Wing Door and left the building.

### Subsequent Conduct

During the Konolds' time in the Capitol building, Cory stole a police riot helmet, likely after finding it on the ground. Based on the way he triumphantly brandished the helmet, he appeared to regard it as a trophy of the rioters' rout of the police and capture of the building:

 

*Stills from Ex. 8 at 04:35, 04:38*

Cory took the helmet with him when he left the Capitol and traveled home; it was eventually turned over to law enforcement with his cooperation.

Felicia celebrated after the fact by taking to social media to celebrate her role. In a video posted to her followers, she joyfully recounted: "I never could have imagined having that much of an influence on the events that unfolded today. Dude, people were willing to follow. You fucking lead, and everyone had my back." Gov. Ex. 6 at 00:13 - 00:36. Similarly, in her private journal, she acknowledged how much resistance from law enforcement she and her co-defendants had overcome — they "persisted through rubber bullets, chemical sprays, baton beating, physical

resistance and doors" — and noted what she believed to be the historical significance of their achievement — they "occupied the Capitol building in Washington [for the first time] since the British hundreds of years ago." The journal celebrated that the American people "took a fucking stand" against the "treasonous behavior of their corrupt government… causing the politicians to run SO FAST from their seats." Gov. Ex. 1 at 3-4.

## III.    THE CHARGES AND PLEA AGREEMENT

On January 12, 2022, a federal grand jury returned a superseding indictment charging Felicia Konold, Cory Konold, and others with Conspiracy, in violation of 18 U.S.C. § 371; Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2); Obstruction of Law Enforcement during a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); and Disorderly Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) On November 1, 2023, Felicia and Cory were each found guilty of Obstruction of Law Enforcement during a Civil Disorder based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Felicia Konold and Cory Konold now face sentencing on one count each of 18 U.S.C. § 231(a)(3).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendants each face up to five years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government agrees with the guidelines calculation set forth in the Presentence Report except for its application of a 2-level reduction to Cory Konold's offense level because of his status as a "zero-point offender."[2]

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter, but was not in place at the time the parties entered into the plea agreement.

Section 4C1.1 does not apply in this case because the Konolds do not satisfy § 4C1.1(a)(3) ("the defendant did not use violence or credible threats of violence in connection with the offense"). As described above, both Felicia and Cory used violence when they and others forcibly shoved against a barricade in an effort to overpower the officers on the other side. "Violence," in federal criminal law, generally means physical force against a person or property. *See* 18 U.S.C. § 16; *see also, e.g.*, *United States v. Bochene*, 21-cr-418 (RDM) (denying § 4C1.1 reduction to Jan. 6 defendant convicted of 18 U.S.C. § 1752(a)(1) who attempted to break a window); *United States v. Giberson*, 23-cr-115 (CJN) (denying § 4C1.1 reduction to Jan. 6 defendant convicted of 18 U.S.C. § 231 who helped shove against officers in tunnel). In this case, the Konolds used force — indeed, the full force of their combined strength — to try to topple a barricade. And although this

---

[2] As the Presentence Report for Felicia Konold correctly reflects, she is not eligible for the reduction because she has a prior conviction that scores a criminal history point. For both defendants, the application of § 4C1.1 would have no effect on the advisory guideline range.

effort did not involve going "hands on" with an individual officer, the Konolds used force transitively against the police who were pushing against the barrier from the other side in an attempt to prevent the crowd's advance. The potential for injury from the Konolds' conduct is obvious, as demonstrated by the injuries sustained by multiple officers during the Peace Circle breach when they were knocked over by rioters pushing through the barriers there.

The Konolds' use of force at the Capitol is especially disqualifying given the context that preceded and surrounded it, including their lengthy participation in a mob that was highly violent in the aggregate. The January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption.  Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol

attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[3]

The U.S. Probation Office calculated both defendants' criminal history as category I, which is not disputed. PSR ¶ 56. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 8, the Guidelines imprisonment range for both defendants is 0 to 6 months' imprisonment. The defendants' plea agreements contain an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

---

[3] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, the felonious conduct of Felicia Konold and Cory Konold on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The Konolds stood proudly at the forefront of that riot at multiple key junctures, and they joined directly in physically resisting law enforcement. The nature and circumstances of the offense were of the utmost seriousness, and fully support the government's recommendation of a custodial sentence.

### B.  The History and Characteristics of the Defendants

*Felicia Konold* was 26 when she took part in the attack on the Capitol and is 29 now. Based on her statements to the Probation Office, ███████████████████████████████

14

Regardless, nothing in Felicia's background significantly mitigates her culpability for the offense of conviction. As shown by her statements before and after the event, and by her sustained efforts over a lengthy period of time at the Capitol, Felicia's criminal acts were not the result of a sudden impulse or a failure to know right from wrong. Rather, as her diary indicates, she committed the crime because she chose to place her opposition to the government above all over concerns, including the law and her own family. Felicia "persisted through rubber bullets, chemical sprays, baton beating, physical resistance and doors" and "occupied the Capitol building in Washington [for the first time] since the British hundreds of years ago" — all in order to "[take] a fucking stand" against the "treasonous behavior of their corrupt government." Gov. Ex. 1 at 3-4. She proudly recorded her joy at "causing the politicians to run SO FAST from their seats." *Id*. And as her pre-planning notes indicate, she fully anticipated that she would be engaged in violence, creating an apparent gear list that included bear spray. Nothing in her background excuses this course of conduct, which warrants a significant period of incarceration.

***Cory Konold*** was 25 when he took part in the attack on the Capitol and is 28 now. His motivations for committing the offense are somewhat less clear, as the government does not possess contemporaneous statements like those from Felicia. Whatever his reasons for going to the Capitol, however, Cory's actions and demeanor throughout the riot show that he enthusiastically embraced the unlawful course of conduct on which he embarked. The image above of Cory cheering while triumphantly lifting a USCP helmet over his head, right after he had watched officers run for their lives from the pursuing mob, speaks nearly as loudly as Felicia's social media posts celebrating what transpired.

The government is aware of nothing in Cory's background that might mitigate his culpability for the offense. His history and characteristics, therefore, weigh in favor of a sentence in the middle of the guidelines range.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. The Konolds' criminal conduct on January 6 was the epitome of disrespect for the law.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to these particular defendants also weighs in favor of a lengthy term of incarceration.

Felicia has a criminal record predating the instant offense; as the PSR documents, she committed a DUI offense in February of 2020 in which she was sufficiently intoxicated to cause a serious wreck. What's more, Felicia's DUI case was pending when she committed the instant offense. She ultimately received a plea deal that resulted in no custodial sentence, but even before

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

that case was resolved, the prospect of facing criminal consequences was not enough to deter her from committing a subsequent, even more serious, crime. A significant custodial sentence is now necessary to impress upon Felicia that future criminal acts will have real consequences.

Cory's actions at the Capitol, as compared to Felicia's, were less egregious and appear more akin to those of someone tagging along with his sister, the driving force of the pair. This fact does not, however, diminish the need for specific deterrence. Cory committed a felony and did so with apparent glee — despite seeing acts of violence against police and property all around him throughout the course of the day. In video of the riot, it does not appear even once that Cory tried to calm down his sister or to be the voice of reason. Instead, he joined her in stampeding over the fences, shoving against the barricades, and pursuing fleeing officers through the building. The next time Cory faces a choice between joining in wrongdoing or walking away, his decision must be informed by the reality of the consequences.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

    **F.**    **Unwarranted Sentencing Disparities**

    Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

    Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Cooke*, 1:22-CR-00052, the defendant, like the Konolds, was one of the first participants in a perimeter breach, and like Felicia he bragged about it afterward. Like the Konolds, he pushed against a bicycle rack manned by officers, and like Felicia he verbally incited other rioters. Like these defendants, Cooke pleaded guilty to one count of civil disorder in violation of 18 U.S.C. § 231(a)(3). Although Cooke's guideline range was higher because he made direct physical contact with an officer, and he also used a flagpole to strike an already-broken window, his conduct was less serious than the Konolds' in other ways because (1) the breach Cooke was part of was subsequent to the original breach that the Konolds helped accomplish; (2) Cooke, unlike the Konolds, did not enter the building; and (3) Cooke did not act as part of a large coordinated group like the Konolds did. Cooke was sentenced to one year and one day in prison.[7]

*United States v. Cortez*, 1:21-CR-00317, is another comparable case involving a guilty plea to the same offense. In *Cortez*, the defendant did not arrive at the Capitol until the riot was already well underway; unlike the Konolds, he was not part of the first wave to breach the restricted area. Like the Konolds, however, Cortez entered the building and was, at times, active on the front lines of rioters, undeterred by officers' efforts to disperse the crowds. Like Felicia, he shouted incitement at fellow rioters and taunts at the police. And like Felicia, his social media activity afterward showed that he regarded himself as a hero for the way he acted at the Capitol. Cortez was sentenced to four months in custody.

---

[7] The government requested 11 months, but the Court increased the sentence to over one year at the request of the defense to make the defendant eligible for more favorable Bureau of Prisons time computation.

It bears noting that the defendants discussed just above—like the vast majority of January 6 defendants—acted individually or in small family/friend groups. The Konolds, by contrast, joined early in the day with a large and organized group, greatly increasing their effectiveness in creating disorder and contributing to the day's events. This is an aggravating factor that sets the Konolds apart from the mine-run defendant convicted of 18 U.S.C. § 231(a)(3).

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that the Konolds must each pay $2,000 in restitution, which reflects

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

in part the role they both played in the riot on January 6.[9] *See* ECF 206 at ¶ 13 (Felicia); ECF 209 at ¶ 13 (Cory). As the plea agreements reflect, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) The defendants' restitution payments must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* Felicia Konold PSR ¶ 100; Cory Konold PSR ¶ 100.

---

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of, for Felicia Konold, 6 months in custody; and for Cory Konold, 3 months in custody, plus 3 years of supervised release for both defendants.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:      */s Conor Mulroe*
Conor Mulroe
NY Bar Number 5289640
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
(202) 330-1788
conor.mulroe@usdoj.gov

Andrew S. Haag
   MA Bar Number 705425
Samantha R. Miller
   NY Bar Number 5342175
Assistant United States Attorneys
601 D Street NW
Washington, D.C. 20530
(202) 252-7755
andrew.haag@usdoj.gov