# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
|  | ) |
|  | ) |
| v. | ) Case No. 21-cr-160-TJK |
|  | ) |
|  | ) |
| FELICIA KONOLD, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

## SENTENCING MEMORANDUM OF FELICIA KONOLD

Felicia Konold made exceptionally poor decisions on January 6. At the moment the first police line was being overrun near the Peace Circle, the Arizonan trampled over toppled barricades and made her way to the west front of the Capitol. After pushing through another police line, she entered the building in a scene of chaos. At one point, Ms. Konold used her hand to hold up a metal barrier separating rioters from law enforcement officers.

Ms. Konold pled guilty to interfering with law enforcement officers during a civil disorder. She is remorseful for her crazed conduct that day. At sentencing, she will apologize to law enforcement and members of Congress and their staff for the distress to which she contributed.

But several considerations argue for caution in determining the severity of Konold's punishment. They are reflected in the Probation Office's recommendation that Konold receive a sentence of time served. Konold, 29, is a single mother of two young children, one of them 13 years old and the other two years old. The latter was conceived by in vitro fertilization and his biological father is unavailable and, indeed, unknown. There is no other caregiver for the children. Moreover, a neuropsychological evaluation assesses that a longstanding psychiatric

1

condition (now being treated)—combined with the residual effects of a traumatic brain injury—rendered Ms. Konold less aware of her actions during the event in question. Ms. Konold had an uncommonly harsh upbringing. Given her unusual family circumstances and the collateral impact of incarceration on her young children, the very low probability that she will recidivate, her sincere remorse, and the need to avoid unwarranted sentence disparities (particularly between this case and *United States v. Hazelton*, 21-cr-30-JDB), Konold respectfully requests that the Court impose the well-considered sentence recommended by the Probation Office.

**Factual background**

### A.  Konold's background, family, employment history, and character

Konold's upbringing in Tucson, Arizona was unhappy. Her father left when she was still very young but not before physically abusing her. As her mother was also abusive, Ms. Konold eked out a rocky childhood. When she was 14 years old, Konold's "boyfriend" moved into the family home. The young teenager became pregnant, had a miscarriage, and then gave birth to her first child at age 15. Presentence Investigation Report (PSR), ¶ 65. By 16, Konold had moved out of her mother's home and struck out on her own. Ms. Konold performed poorly in school but ultimately obtained a GED in 2011 after giving birth to her first son.

Between the ages of 15 and 22, Ms. Konold had five suicide attempts and ten additional suicide gestures. Neuropsychological Assessment, dated 3/24/2022, Exh. 1, at 2. At age 13 she was briefly hospitalized for bipolar disorder. She was prescribed medication for this condition but discontinued the use of psychotropics due to adverse side effects. *Id.* A psychologist has noted that her "medical history is remarkable for multiple head injuries from activities such as horseback riding and more recently a motor vehicle accident where she drove her vehicle off the road, flipping the vehicle through a fence, and then being ejected." *Id.* The latter injury was

incurred in February 2020.  As a result, "she had a severe facial/head injury with loss of consciousness and retrograde and anterograde amnesia." *Id.*  Indeed, Ms. Konold reported "a total of '13' head injuries with either loss of consciousness, alteration of consciousness, and/or a post concussive syndrome throughout her life span." *Id.*  The psychologist added:

> A review of a comprehensive neurological evaluation completed by G. Alex Hishaw, MD, The University of Arizona Health Services, indicates that Ms. Konold has deficits in immediate memory and some aspects of expressive language. . . Of note: Ms. Konold reported to Dr. Hishaw that she was "concerned that she may make poor decisions."

Exh. 1, p. 2.

The psychologist notes that after Ms. Konold's latest traumatic brain injury, which occurred before January 6, "she stopped working and was drawn to conspiracy theories on the internet/social media." *Id.*  All these considerations led the psychologist to assess that Ms. Konold suffers from the condition known as *la belle indifference*:

> *La belle indifference* is defined as a paradoxical absence of psychological distress despite having a serious medical illness or symptoms related to a health condition. There is a plethora of case studies in the literature that correlate head injuries with the *la belle indifference* in both right and in left hemispheric injuries secondary to a disconnection syndrome. The clinical presentation is often misdiagnosed. In this case, the improvement in her predominate negative emotional functions is consistent with right hemispheric damage and consistent with the site of injury. However, given her pre-morbid diagnosis of Bipolar I Disorder, the resulting injury caused an increase in impulsive behaviors, including her driving cross country to attend the [January 6] rally. During the initial telephonic consultation with Ms. Konold and her attorney, she impulsively stated that she would drive to the National Capital Region [from Arizona] just to have the clinical interview. This level of impulsivity is directly related to the manic behaviors of a bipolar patient combined with the impulsiveness of a head trauma victim.

Exh. 1, p. 4.

In connection with the conviction here, the psychologist assessed that, "[a]t the time of the offense, Ms. Konold was impaired by a longstanding psychiatric condition as well as the residual effects of a traumatic brain injury.  As such, she was less aware of her actions."  Exh. 1,

p. 4.  Ms. Konold has subsequently sought out a behavioral health intervention, as recommended by the psychologist.

Today, and after undergoing therapy and psychological evaluation, Ms. Konold raises her 13-year-old and two-year-old sons at their home in Tucson, which is owned by her aunt who recently passed away.  She is employed by two veterinary hospitals.  Ms. Konold is the sole caregiver for the two-year-old.  Because he was conceived through in vitro fertilization, he does not have any relationship with a biological father.  PSR, ¶ 65.  Ms. Konold's healthcare, including mental health treatment, is provided by her current employers.  If she were to be sentenced to a term of incarceration, she would lose her employment and with it her healthcare benefits, including the psychological treatment on which she now relies.  The 13-year-old's father relies on Ms. Konold's income for all basic necessities that he provides to the boy.

Ms. Konold's letters in support demonstrate a few of her essential qualities: her devotion to and constant care for her children; her hard work at the veterinary hospitals and love of animals; and her passion for community improvement.  Exh. 2.

### B.     The conviction and presentence investigation report

On November 1, 2023, Konold pled guilty to Count Three of the Indictment, charging interference with law enforcement officers during a civil disorder under 18 U.S.C. § 231(a)(3).

The stipulated facts are as follows.  Ms. Konold traveled across the country with her younger brother, Cory Konold, to attend the former president's rally on January 6.  Along the way they encountered some of the co-defendants in this case, including Christopher Kuehne and Luis Enrique Colon.  Ms. Konold understands that some of those defendants may be members of the Proud Boys from the Kansas City area, but Ms. Konold herself is not a member of that

suspect organization.  (Counsel understands that membership in the organization does not include women.) PSR, ¶ 23.

On January 6, Konold followed the crowd of Proud Boys members and others toward the Capitol Building.  At around 1:00 p.m. a crowd standing near the Peace Circle breached the first line of police guarding the Capitol.  Konold was among them.  She trampled on overturned police barricades and made her way to the west front of the Capitol, where she remained for over an hour.  PSR, ¶ 24.

Konold and her brother pushed through another police line, at one point shouting, "Fight for America! Fight for America!" PSR, ¶ 26.  Ultimately, Konold entered the building and made her way to the Crypt.  There, some U.S. Capitol Police officers positioned themselves on the opposite side of a large, sliding-door-style metal barrier that was being lowered from overhead.  Ms. Konold at one point used her hand to push up on the metal barrier.  She entered the Capitol Visitor Center and a short time later, left the building.  *Id.*, ¶ 29.

The PSR identifies U.S.S.G. §2A2.4 as the controlling guideline.  PSR, ¶ 45.  The base offense level is 10.  *Id.*  The PSR then decreased Ms. Konold's offense level by two levels for her acceptance of responsibility.  *Id.*, ¶ 52 (citing U.S.S.G. §3E1.1(a)).

Thus, the PSR calculated Konold's total offense level at 8.  In Criminal History Category I, that would generate a Guidelines range of 0-6 months' incarceration.  PSR, ¶ 82.

On January 2, the Probation Office recommended a sentence of time served with one year of supervised release and restitution in the amount of $2,000.  1/2/2024 Probation Office Recommendation.  The Office explained:

Ms. Konold has limited criminal history. She recalls a difficult upbringing, becoming pregnant at the age of 15 and living on her own by age 16. She was in an abusive relationship and also suffered from emotional abuse from her mother. Numerous head

injuries have caused her to struggle with mental health issues. Ms. Konold is currently employed at two veterinary clinics and resides in Arizona with her two sons.

Considering the nature of the offense, the defendant's limited criminal history, and her personal characteristics, a guideline sentence of time served is recommended. The recommended sentence is sufficient, but not greater than necessary to reflect the seriousness of the offense and to promote respect for the law, as well as to protect the public from further crimes of the defendant.

*Id.*

**Argument**

**I.      Sentencing procedure**

As it knows, the Court has broad discretion to consider nearly every aspect of a particular case, and a particular defendant, in fashioning an appropriate sentence. *United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007). Although the Court must first calculate the appropriate sentencing range under the Guidelines, it is not bound by the Guidelines or Guidelines Policy Statements. It may make its own policy judgments, even if different from those in the Guidelines. *Kimbrough*, 552 U.S. at 101.

The Court must merely impose a sentence consistent with the terms of 18 U.S.C. § 3553(a) and § 3661. As the Court knows, the cardinal requirement of § 3553(a) is that the "court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes of [§ 3553(a)]. . ." § 3553(a).

**II.     The § 3553(a) factors favor the sentence recommended by the Probation Office**

**A.      The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1))**

A number of considerations under § 3553(a)(1) warrant the sentence recommended by the Probation Office: (1) Konold's minor children do not have an adequate substitute caregiver;

6

(2) Konold's psychiatric history and history of traumatic brain injury; (3) nearly all the §
231(a)(3) cases are more severe than Konold's; (4) Konold's cooperation with the government;
(5) first-time offender status and atypical conduct; (6) her family and community support; and
(7) her sincere remorse.

### 1.    The deleterious effects on Konold's young children

While a Guidelines policy statement provides that "family ties and responsibilities are not
ordinarily relevant in determining whether a *departure* may be warranted," U.S.S.G. §5H1.6,
(emphasis added), it is still proper to downwardly vary on that basis and, in any case, the Court is
empowered to disagree with the Guidelines on policy grounds. *E.g.*, *United States v. Munoz-
Nava*, 524 F.3d 1137 (10th Cir. 2008) (downwardly varying based on defendant's role as a
caregiver for eight-year-old son and elderly parents). After *Gall*, the sentencing court does not
need to find the defendant's family responsibilities "extraordinary" in order to disregard the
policy of U.S.S.G. §5H1.6. *E.g.*, *United States v. Warfield*, 283 Fed. App'x 234, 235 (5th Cir.
June 20, 2008).  As in every discretionary sentencing decision, the standard is reasonableness.

Here, the deleterious effects on Konold's young children from a sentence of incarceration
would be profound.  Konold is the primary caregiver to two minor children and is responsible for
their daily sustenance.  Her two-year-old son does not have any relationship with a biological
father.  Indeed, thanks to the in vitro fertilization process, the two-year-old may be contractually
barred from obtaining the identity of his biological father.  If Konold is sentenced to prison time,
there will be no alternate caregiver available and the child would likely be delivered to foster
care.

It is difficult to overstate the negative toll this would have on the young children
throughout their lives.  Damage would likely result in several domains: school success, peer

relationships, knowledge, mood, behavior and attachment.  Some of these effects could take

many years and specific personal and therapeutic attention to repair.  Disruptions to school

progress might lead to poor academic success, being held back, or stigmatization.  Effects on

mood disorder might lead to suicide or other disabling conditions.  *See*, *e.g.*, Lewis M (Ed).

*Child and Adolescent Psychiatry: A Comprehensive Textbook* (3rd Edition. Lippincott, Williams,

and Wilkins, Philadelphia 2002).

Virtually identical circumstances existed in *United States v. Hazelton*, 21-cr-30-JDB.

Like Ms. Konold, Hazelton was convicted under § 231(a)(3) for her nonviolent conduct on

January 6.  *Id.*, ECF 57.  Like Ms. Konold, Hazelton was the primary caregiver to two young

children.  *Id.*, p. 15.  This factor was decisive in Judge Bates' sentence of 10 days' incarceration

followed by 24 months of supervised release.  *Id.*, 6/01/2023 Minute Entry.

The Court has sentencing options available that would both deter Konold and avoid doing

extreme harm to young children.  These considerations powerfully argue for the sentence

recommended by the Probation Office.  *Munoz- Nava*, 524 F.3d at 1137.

**2.     Konold's psychiatric history and history of traumatic brain injury**

A mitigated sentence may be justified by a defendant's mental health status.  *United*

*States v. Burroughs*, 613 F.3d 233, 239 (D.C. Cir. 2010); *United States v. Sweet*, 2007 U.S. Dist.

LEXIS 3914, at *4 (D.D.C. Jan. 15, 2007) ("Defendant's psychiatric history . . . argue[s] in favor

of a variance.").

As discussed, a neuropsychological evaluation assessed that, "[a]t the time of the offense,

Ms. Konold was impaired by a longstanding psychiatric condition [bipolar disorder] as well as

the residual effects of a traumatic brain injury.  As such, she was less aware of her actions."

Exh. 1, p. 4.  Indeed, Ms. Konold may have suffered up to 13 traumatic brain injuries in her

8

lifetime.  To the extent Konold's crime was attributable in part to these then-untreated neurological conditions out of her control, including *la belle indifference*, a reduced sentence is warranted.  *Sweet*, 2007 U.S. Dist. LEXIS 3914, at *4.

> **3.** **Nearly all the § 231(a)(3) cases are more severe than Konold's**

Konold was convicted under § 231(a)(3) though she did not engage in an act of violence against law enforcement officers.  That distinguishes her case from most other January 6 cases involving the same charge:

| § 231(a)(3) 1/6 Defendant | Case No. | Violent criminal conduct |
|---|---|---|
| Adams | 21-cr-84 | Pushed police officers against a wall |
| Alam | 21-cr-190 | Threw punches at law enforcement |
| Antonio | 21-cr-497 | Threw objects at police |
| Ballard | 21-mj-529 | Threw tabletop at police |
| Bingham | 21-mj-430 | Threw punch at officer |
| Brock | 21-mj-527 | Striking police with rod |
| Brockhoff | 21-mj-444 | Shooting fire extinguisher at police |
| Brown | 21-mj-565 | Spraying pepper spray in officers' faces |
| Brown | 21-mj-498 | Pushing and punching police |
| Buteau | 21-mj-487 | Throwing hard objects at police |
| Byerly | 21-mj-500 | Tasing police |
| Caldwell | 21-cr-181 | Spraying pepper spray at police |
| Chrestman | 2021 U.S. Dist. LEXIS 36117 | Threatening to assault officers |
| Cua | 2021 U.S. Dist. LEXIS 44293 | Shoving officer |
| Coffee | 21-cr-327 | Hitting officer with crutch |

| | | |
|---|---|---|
| Copeland | 21-mj-403 | Shoving and grabbing officer |
| Council | 21-mj-08 | Shoving officers |
| Dasilva | 21-mj-520 | Grabbing, pushing and pulling police |
| Davis | 21-mj-536 | Shoving police |
| DeGrave | 2021 U.S. Dist. LEXIS 92102 | "Coming to blows" with police |
| Egtvedt | 21-cr-177 | Throwing punches at police |
| Fairlamb | 21-cr-120 | Shoving and punching police |
| Fitzsimons | 21-cr-158 | Punching officers |
| Foy | 2021 U.S. Dist. LEXIS 123953 | Swinging hockey stick and throwing objects at police |
| Galetto | 21-mj-386 | Knocking officer to the ground |
| Hayah | 21-mj-577 | Shoving officers |
| Jenkins | 21-cr-245 | Throwing pole at officers |
| Johnson | 21-cr-332 | Knocking over officer who falls unconscious |
| Judd | 21-cr-40 | Throwing object on fire at police |
| Klein | 21-cr-236 | Striking officers with shield |
| Lang | 21-cr-53 | Thrusting a bat and shield at officers |
| Languerand | 21-cr-353 | Throwing garbage cans at officers |
| Lazar | 21-mj-533 | Spraying chemicals at police |
| Mackrell | 21-cr-276 | Striking multiple officers |
| McCaughey III | 21-cr-40 | Striking multiple officers |
| McGrew | 21-cr-398 | Striking officer |
| McHugh | 21-cr-453 | Macing officers |
| McKellop | 21-cr-268 | Macing officers |

| Mellis | 21-cr-206 | Striking officers with a stick |
|---|---|---|
| Middleton | 21-cr-367 | Poking officers in the face |
| Miller | 21-cr-75 | Spraying officers with pepper spray |
| Morss | 21-cr-40 | Striking officer with shield |
| Mullins | 21-cr-35 | Assaulting officer |
| Nichols | 21-cr-117 | Spraying pepper spray at officers |
| Owens | 21-cr-286 | Striking officer in the head with skateboard |
| Padilla | 21-cr-214 | Ramming cop with metal sign |
| Palmer | 21-cr-328 | Spraying fire extinguisher in face of officer |
| Pezzola | 21-cr-52 | Smashing large window of Congress, a crime of violence |
| Quaglin | 21-cr-40 | Striking multiple officers |
| Randolph | 21-cr-332 | Assaulting officer |
| Sabol | 21-cr-35 | Striking officer |
| Sandlin | 21-cr-88 | Attempting to rip helmet off officer |
| Sandford | 21-cr-86 | Throws fire extinguisher at officers |
| Sargent | 21-cr-258 | Throwing punches at officers |
| Schwartz | 21-cr-178 | Bear spraying officers |
| Shively | 21-cr-151 | Assaulting officers |
| Sibick | 21-cr-291 | Attempting to take officer's gun, while threatening to kill him |
| Stager | 21-cr-35 | Smashing officer with flag pole |
| Stevens | 21-cr-40 | Striking officer with shield |
| Warnagris | 21-cr-382 | Shoving officer |

| Webster | 21-cr-208 | Striking officer with flag pole |
| Woods | 21-cr-476 | Tripping officer and pushing her to ground |

That Konold's interfering acts did not involve physical violence against officers is a powerful ground for imposing the sentence recommended by the Probation Office.

### 4.   Konold's cooperation with the government

Early in her case, Konold agreed to meet with prosecutors and federal agents for an hours-long interview and proffer session. This early, substantial, and uncommon cooperation with the government supports the sentence recommended by the Probation Office.

### 5.   First-time offender and atypical conduct

The fact that Konold is a first-time offender, and that the offense conduct is atypical for her, is an appropriate basis for a mitigated sentence. *United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008) (affirming that district court's downward variance from 60-to-79-month range to below the calculated Guidelines range was reasonable and permissibly took into account the defendant's lack of a criminal record); *United States v. Munoz-Nava*, 524 F.3d 1142, 1143 (10th Cir. 2008) (downward variance to one year imprisonment and one year home confinement from recommended Guidelines range of 65-78 months imprisonment supported by district court's finding of several factors including that defendant had no felony criminal record and his offense was "highly out of character"); *United States v. Tomko*, 562 F.3d 558, 560 (3d Cir. 2009) (affirming probationary sentence based partly on defendant's "negligible criminal history").

That the Guidelines already take into account Konold's lack of criminal history does not mean that it is inappropriate for the Court to vary downward on the same basis. *See United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) ("[I]t is not error for a district court to

enter sentencing variances based on factors already taken into account by the Advisory Guidelines . . . when a district court applies broader § 3553(a) considerations in granting [a sentencing] variance.").

The many letters submitted on Konold's behalf clearly demonstrate that her conduct on January 6 was atypical.  Exh. 2.

### 6.    Konold's community and family support

The support on the outside that a defendant can be expected to receive from family and community members is another valid basis for a mitigated sentence. *E.g.*, *United States v. Sayad*, 589 F.3d 1110, 1114-15 (10th Cir. 2009) (defendant's "supporting and loving family" a reason for downward variance); *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (family support one of several valid grounds for downward variance from 41-51 months to probation); *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008) (family support one of three valid reasons for 91-month downward variance).

As shown above, Konold has an extensive network of friends that can provide her with the support she needs for successful rehabilitation.  The letters submitted on her behalf demonstrate that Konold has their unequivocal support.  Exh. 2.

### 7.    Konold's remorse

A defendant's true remorse, whether exceptional or not, is a valid basis for a mitigated sentence.  *E.g.*, *United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008).

Konold is earnestly remorseful for her misconduct on January 6.  In her allocution, she will apologize to law enforcement and members of Congress and their staff for her role in the riot.

### B.    Avoiding unwarranted sentence disparities (§ 3553(a)(6))

Section 3553(a) requires courts to fashion a sentence in a way that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).  Sentencing Konold to a term of incarceration would create unwarranted sentence disparities along several levels.

As indicated, the defendant in *Hazelton* was sentenced for a conviction under the same statute as Konold.  *Hazelton*, 21-cr-30-JDB.  Like Ms. Konold, Hazelton was the caregiver to two young children.  *Id.*, ECF 57, p. 15.  Hazelton stood outside the lower west terrace tunnel and encouraged more men to enter the Capitol.  Like Ms. Konold, she did not engage in violence.  Judge Bates imposed a sentence of 10 days' incarceration followed by 24 months of supervised release.  *Id.*, 6/01/2023 Minute Entry.  Imposing a longer sentence on Ms. Konold would create an unwarranted sentence disparity.  If anything, Ms. Konold should receive a lighter sentence given that Hazelton, unlike Konold, at least had a husband who could provide care to the children during Hazelton's ten days of incarceration.

The government's comparisons with *United States v. Cooke*, 22-cr-52 and *United States v. Cortez*, 21-cr-317 are misplaced.  Gov't Sentencing Mem., pp. 20-21.  Cooke committed multiple assaults of law enforcement officers and smashed a Capitol window with a flag pole.  *Cooke*, 22-cr-52, ECF 52, pp. 6-32.  The young man brought firearms to D.C.  *Id.*, p. 34.  He celebrated when a companion exclaimed, "Go get Nancy. I want to scalp that bitch." *Id.*, p. 31.  He is not the sole caregiver to two young children with a history of traumatic brain injury.  The most salient fact about his case is that he was permitted to plead guilty to the same offense that Konold pled to.

Cortez was far more aggressive and confrontational than Konold.  *Cortez*, 21-cr-317, ECF 71, pp. 19-22.  Police shot a cloud of pepper spray into a large group that included Cortez to

dissuade them from entering the building.  *Id.*, p. 19.  On his own, Cortez braved the haze in a demonstration to the rioters that they could push ahead.  He then smashed a flag pole repeatedly in front of the police to intimidate them and encourage the crowd.  *Id.*, p. 20.  He screamed, "Fuck you!" and "Oath breakers" at the officers.  His actions prevented officers from taking further action to block an entrance to the building.  *Id.*  And, again, the young man was not the sole caregiver to two young children with a history of traumatic brain injury.

Consider instead the case of Matthew Wood. Wood was convicted of a § 1512(c) offense, a conviction more serious than Konold's.  *U.S. v. Matthew Wood*, 21-cr-223-APM (D.D.C. 2021), Gov't Sentencing Mem., ECF 55, p. 46.   And Wood's conduct was more serious than Konold's.  Before January 6, Wood vowed to "raid Congress" and "be brave heart in that bitch." *Id.*, p. 2.  Terrifyingly, he compared his red car to "the blood I will shed" in D.C.  *Id.*, p. 60.

Wood was one of the first rioters in the building and one of the last to leave.  *Id.*  He remained inside for 80 minutes.  *Id.*, p. 59.  Wood was constantly encouraging other rioters to enter the building and breach barricades.  *Id.*  Unlike Konold, he was not a sole caregiver to young children and did not have a history of traumatic brain injury.

Wood received a sentence of 36 months' probation with 12 months of home detention. *U.S. v. Matthew Wood*, 21-cr-223-APM (D.D.C. 2021), ECF 65.  Sentencing Konold to a term of incarceration would create an unwarranted disparity with Wood.

Or consider William Isaacs.  Isaacs was not only a key member of the Oath Keepers militia, he was also convicted of conspiring to violate § 1512(c), as well as several other felonies of which Konold is not guilty.  *U.S. v. Isaacs*, 21-cr-28-APM (D.D.C. 2021).  Plainly, the conduct of the Oath Keepers, many of whom were found guilty of seditious conspiracy, was far more serious than Konold's.  Isaacs was sentenced to 60 months' probation, 500 hours of

community service, and 18 months of home confinement.  Sentencing Konold to a term of incarceration would create an unwarranted disparity with Isaacs.

Finally, a term of incarceration would create unwarranted disparities between Konold's sentence and sentences imposed on parading/demonstrating defendants in January 6 cases.  In many instances, the conduct of these probationary misdemeanants was more disruptive than Konold's.  Department of Justice January 6 Sentencing Chart, available at: https://www.justice.gov/file/1593211/download.  Here are some examples:

| 1/6 Def. & Case No. | Charge | Sentence | Offense Conduct |
|---|---|---|---|
| Josh & Jessica Bustle, 21cr238 | Parading in Capitol | 24 mos. probation and 24 mos. supervised release | Entered Capitol Building, remained for 20 minutes. Posted on Facebook, "Pence is a traitor. We stormed the capital (sic). . . We need a revolution!" |
| Bryan Ivey, 21cr267 | Parading in Capitol | 36 mos. probation | Entered Capitol Building through a breached window, waving additional rioters into the building, spending 30 minutes inside. |
| Valerie Ehrke, 21cr97 | Parading in Capitol | 36 mos. probation | Entered Capitol Building. |
| Andrew Bennett, 21cr227 | Parading in Capitol | 3 mos. home confinement, 24 mos. probation | Entered the Capitol Building, livestreaming the event on his Facebook page for over an hour. |
| Lori, Thomas Vinson, 21cr355 | Parading in Capitol | 5 years probation, 120 hours of community service | Entered the Capitol Building, later telling news outlet that her actions were "justified" and that she would "do this all over again." |

| Jordan Stotts, 21cr272 | Parading in Capitol | 24 mos. probation | Entered the Capitol Building, remained inside for an hour, celebrating with others and taking videos with his cell phone. |
|---|---|---|---|
| Douglas Sweet, Cindy Fitchett, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, Fitchett filming herself saying, "We are storming the Capitol. We have broken in." |
| Rasha Abdual-Ragheb, 21cr42 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, desiring to demonstrate against Congress. |
| Jonathan Sanders, 21cr384 | Parading in the Capitol | 36 mos. probation, 60 hours community service | Entered the Capitol Building, intending to protest presidential election |
| Michael Orangias, 21cr265 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures inside. |
| John Wilkerson, 21cr302 | Parading in the Capitol | 36 mos. probation, 60 hours of community service | Entered the Capitol Building, posting on social media, "today was a good day, we got inside the Capitol." |
| Brandon Nelson, 21cr344 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, co-defendant texting, "We stormed the Capitol and shut it down. Currently still inside" and "Patriots won't go down without a fight." |
| Andrew Wrigley, 21cr42 | Parading in the Capitol | 18 mos. probation | Entered the Capitol Building, taking pictures of himself inside |
| Jacob Hiles, 21cr155 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures showing him |

| | | | smoking "an unknown substance" inside. |
|---|---|---|---|
| Bruce Harrison, 21cr365 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures of himself inside. |
| Terry Brown, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, disobeyed police order to leave. |
| Felipe Marquez, 21cr136 | Disorderly conduct in the Capitol | 18 mos. probation | Entered the "hideaway" office of Senator Merkley, saying, "We only broke a couple windows." |
| Michael Rusyn, 21cr303 | Parading in the Capitol | 24 mos. probation | Among the first to enter the Capitol through a certain door, part of a group of people who shouted, "Tell Pelosi we're coming for that b****," called police traitors, and shouted "Stop the steal." |
| Andrew Hatley, 21cr98 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures with various historical statues. |
| Nicholas Reimler, 21cr239 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures of himself and friends. |
| Caleb Jones, 21cr321 | Parading in the Capitol | 2 mos. home confinement, 24 mos. probation | Entered the Capitol Building, "walking down numerous hallways and into the Capitol Rotunda." |
| Anthony R. Mariotto, 21cr94 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, posting on Facebook, "This is our house" under selfie photograph. |
| Michael Stepakoff, 21cr96 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, posting on |

| | | | |
|---|---|---|---|
| | | | social media after, "The Capitol is OUR house, not theirs." |
| Tanner Sells, 21cr549 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building. |
| Gary Edwards, 21cr366 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, including Senate office S140. |
| Zachary, Kelsey Wilson, 21cr578 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, penetrating all the way to the Speaker's personal office |
| Jennifer Parks, Esther Schwemmer, 21cr363 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures inside |
| Jackson Kostolsky, 21cr197 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building |
| Eduardo Gonzalez, 21cr115 | Parading in the Capitol | 24 mos. probation | Entered the Capitol, smoking marijuana inside "multiple times." |
| Israel Tutrow, 21cr310 | Parading in Capitol | 36 mos. probation | Entered the Capitol Building with a knife |

In short, sentencing Konold to a term of incarceration would create dozens or even hundreds of unwarranted sentence disparities.

## C. The seriousness of the offense and deterrence (§ 3553(a)(2))

The Court must consider "the need for the sentence imposed . . . to reflect the seriousness of the offense" and to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." § 3553(a)(2).

Konold is a mother of two young children with no criminal history. Those biographical facts alone imply she is highly unlikely to recidivate. Prior to January 6, demonstrators at the Capitol who violated relevant law were typically penalized under a process called "post and forfeit": they paid to have their demonstration-related case dropped for approximately $25-100. ACLU, District of Columbia, Demonstrations in D.C., available at:

https://www.acludc.org/en/know-your-rights/know-your-rights-demonstrations-dc.  That was deemed sufficient deterrence.  In contrast, Konold was convicted of a felony in federal court. FBI agents came to her home.  A lengthy sentence of incarceration—along with its destabilizing effect on her children—is not needed to deter Konold from demonstrating at the Capitol again without authorization.  Together with scathing media criticism and social ostracization, a federal conviction—as well as a sentence of probation, home detention, and significant fine—will well and truly deter Konold.  The heavy shame Konold has experienced is itself a guarantee of deterrence.  *See*, *e.g.*, *United States v. Polizzi*, 549 F. Supp. 2d 308, 449 (E.D.N.Y. 2008) (specific deterrence satisfied by "intense shame created by the convictions"); *United States v. Maynard*, 2020 U.S. Dist. LEXIS 179542, at *5 (E.D.N.Y. Dec. 17, 2012) (Weinstein, J.) (same).

**Conclusion**

      For all the foregoing reasons, Konold respectfully requests the sentence recommended by the Probation Office.

Dated: January 17, 2024               Respectfully submitted,

                                   */s/ Nicholas D. Smith*
                                   Nicholas D. Smith (D.C. Bar No. 1029802)
                                   1123 Broadway, Suite 909
                                   New York, NY 10010
                                   Phone: (917) 902-3869
                                   nds@davidbsmithpllc.com

                                   *Attorney for Felicia Konold*

**<u>Certificate of Service</u>**

I hereby certify that on the 17th day of January, 2024, I filed the foregoing submission with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s): Counsel of record.

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

*/s/ Nicholas D. Smith*
Nicholas D. Smith (D.C. Bar No. 1029802)
1123 Broadway, Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com


*Attorney for Felicia Konold*
